## SEALS v. STATE.

No. A-11269.  Oct. 4, 1950.

(222 P. 2d 1037.)

Tolbert & Gillespie, Hobart, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, Ernest Seals, defendant below, was charged by amended information in the district court of Kiowa county, Oklahoma, with the murder of Johnny William Fails, a child five years of age. More specifically the amended information charged that "on or about November 23, 1948, the said Ernest Seals did beat and strike the said Johnny Williams Fails on and about the head, thereby inflicting mortal wounds and injuries, from which mortal wounds and injuries the said Johnny William Fails did on the 25th day of November, 1948, die, as was unlawfully, wilfully, intentionally, maliciously, and feloniously intended by the said Ernest Seals". He was tried by a jury, convicted of the crime of first degree manslaughter, but the penalty was left for the determination of the court, which sentenced him to 25 years in the penitentiary. From that judg-

ment and sentence, the defendant has perfected this appeal.

The first contention of the defendant is that the evidence is insufficient to sustain the judgment and sentence. This contention necessarily requires a review of the evidence contained in the 450 page record of the trial below. It is well, however, for a better understanding of the issues herein involved, that a brief digest of the case be detailed. It appears that the defendant is 37 years of age. He was the father of four children by a former marriage. His first marriage resulted in a divorce and the custody of his four children being conferred upon him, he was compelled by necessity to keep the children of this marriage in the Tipton Orphans Home, until he married the mother of Johnny William Fails. Johnny Fails was born out of wedlock. Prior to the marriage of Mr. and Mrs. Seals, Johnny Fails resided wtih his grandparents, Mr. and Mrs. Huff, who were the mother and father of Mrs. Seals. After the marriage of Johnny William Fails' mother to Mr. Seals, his four children and her Johnny William Fails were united on a farm home near Hobart, Okla. At that time Johnny Fails was not quite five years of age and had not yet reached his fifth birthday at the time of the alleged crime. The state's case as to the assault resulting in the fatal injuries to Johnny Fails is based almost entirely on circumstantial evidence. It sought to establish that for a period of approximately 11 months the defendant had subjected Johnny Fails to abuse, beatings and neglect. The object of this evidence was to establish design and intent to murder. On the evening of November 23rd the defendant was milking in the milkshed or barn and Johnny came in and the defendant struck or slapped the child with such force as to produce an intracranial hemorrhage,

either as the result of being struck or as a result of falling against the concrete sill at the door entrance to the barn, from which injuries the child died.

The defendant's theory of defense was that the child was slapped for pulling the cow's tail, but not in a cruel, or unusual manner, and without any intent to injure said child; that he continued milking, that shortly thereafter, he saw that Johnny had fallen and was lying against the concrete sill at the door of the barn. Seeing this he stopped milking and carried him into the house, and later to the hospital. It was further a part of his defense that in slapping the child he did not hit him with any more force than usually employed by the ordinary parent in correcting a child, and that the child's injuries were not produced by him, but were purely the result of an unavoidable accident or fall against the concrete sill, and further that the injury was the result of a predisposition to cranial hemorrhages. Basically these were the issues involved in the prosecution and the defense.

(We regret the necessity of detailing the evidence, but not to do so would be to sacrifice clarity for brevity, which in this case is not justified since the principal objection herein raised is the insufficiency of the evidence. Risking the charge of verbosity, we detail the evidence. We deem it highly advisable in order to distinguish this case from cases involving death produced by ordinary assaults, as well as those involving accidental and unintentional injury in the ordinary case of parental correction. This is no ordinary case hence the necessity for detail.)

The state's first witness, Bill Moreland, a newspaper reporter and photographer, identified State's Exhibits 1 to 9, inclusive, as being photographs taken by him pic-

turing the victim after death, as well as photographs taken of the scene of the crime. He said Exhibits 1 to 3, inclusive, are photographs of the dead child taken on November 26, 1948; and Exhibits 4 to 9 are photographs taken on December 15, 1948, of the milkshed or barn where the defendant allegedly committed the crime.

The next witness was John Gish, funeral director, who testified that he saw the body of the Fails child at the funeral home. He further identified photographic Exhibits 1, 2 and 3 as being true representations of the condition of the Fails child, immediately following its death.

Thereafter the state offered John W. Adams, under-sheriff of Kiowa county, who said he was present when State's Exhibits 1, 2 and 3 were taken. He then testified he talked to defendant, Seals, relative to the cause of his stepson's death. He said Seals' exact words were "I struck him down". He further testified that he had observed the Fails boy at the hospital before his death, and that there were bruises on the right side of his head, and that there were 'several lacerations, lashes, * * * that had healed". He also said there were abrasions and scratches on him, one or two, more or less "were open wounds" . Later, he said, he examined carefully the child's body at the funeral home, and in addition, "observed distinct bruises and three old scars on the back of his body". Moreover, he said on the bottom of Johnny's feet were "thick callouses and heavy growths" and embedded in his feet he said were "goat heads, stickers and splinters" and that he "guessed 150 were pulled out". Further, he said there was a laceration on the scrotum. On both direct and cross-examination he said the child appeared emaciated, thin and in a run-down condition. He further revealed that on November 30, 1948,

at about 8:30 o'clock, the defendant was interviewed in the jail. He said before questioning the defendant was advised he was entitled to aid of an attorney, and that he did not have to make a statement, and what he said might be used against him, and that he was not abused or any promises made to him. After three and a half hours of questioning, and after calling for a Bible and putting his hand on it, he made a written statement. In the statement, he related, Seals said that he slapped or struck Johnny which caused him to fall, and strike his head against the concrete sill and he got up, and carried the child into the house. He further revealed that the defendant admitted striking the child on occasions with a leather strap; that he made Johnny walk a beat at home; that he whipped Johnny more than he did the other children. This statement was never offered in evidence. Adams also identified Exhibits 4 to 9, inclusive, as true representations of the entrance to the milk house. Referring to Exhibit 2, a picture of the dead boy's features, he described a "very dark, discolored spot around the head * * * and abrasions, lacerations, cuts and scratches; open wounds" about the lips. The right side of his head was swollen, the undersheriff testified. The Exhibit No. 2 confirms the description.

E. O. Peters, deputy sheriff of Kiowa county, next appeared as a witness for the state. He testified he talked to defendant, Seals, "at the hospital, out at the house and up in the jail", the latter conversation being on November 29, 1948. He said Seals related to him the story of how the child was injured. That Johnny either pulled the cow's tail or poked her with a stick and made her kick or jump and that Seals slapped the boy, and he hit his head on the concrete sill. Seals said he picked the child up and carried him in the house

and later to the hospital. Peters said he saw Johnny at the hospital and viewed his body later in the funeral home. He told of how there were blue bruised spots all over him "on his back and one the side of his face." Particularly, he pointed to the spot over his right eye and on the right side of his face. He further pointed out that Johnny had stickers on his feet and appeared "awfully poor". He said Seals denied ever striking the boy until he called for a Bible about 1:00 a.m., and said he would tell the truth. Thereafter he related, as hereinbefore described, how the boy met his death. In addition thereto he said Seals admitted beating the boy on several occasions with a leather strap, which was offered in evidence as State's Exhibit No. 10. On cross-examination, Mr. Peters admitted the questioning of Seals started about 8:00 p.m., and lasted until 1:07 a.m., or 5 hours and 7 minutes. He testified that when these things were orally related before being reduced to writing, Carpenter Hughes, Tommy Howard, Mr. Hawkins, Mr. Lee, Tom Hood, Johnnie Adams, Tad Shriner and Leon Jennings were present.

Carpenter Hughes, county attorney for Kiowa county, was the next witness for the state. His evidence was substantially to the same effect as that of Undersheriff Adams and Deputy Peters, except he said the defendant did not admit to him he had beaten the boy with a strap. In addition thereto, however, he did testify Seals admitted requiring Johnny to walk a beat from the garage out to the highway. On cross-examination the county attorney admitted Seals was uneducated, being only able to write his name. He said he advised Seals of his right to counsel. Further on in redirect examination without objection he related that Seals said in his written statement that "I did on November 23 in Kiowa County strike

my stepson, Johnny William Fails". On re-cross-examination he testified that Seals said he turned around and slapped the boy and he fell, that he "did not intend to injure or kill the boy"; that until he confessed, Seals had persistently denied striking the boy. Finally he called for a Bible and said "I am ready". One of the prisoners in the jail loaned the Bible, the county attorney said, and he gave it to him.

Tom Hood, the jailer, testified while he and Seals were talking in the cell Seals repeatedly referred to Johnny as a bastard child, and said, he "naturally could not like a child that he didn't know who his father was as well as he could his own". He said he was present from 9:00 p.m., to 1:00 a.m., in the cell at the jail where Seals was questioned and gave his statement. Moreover he said he talked to Seals alone, at which time Seals described Johnny as a little bastard. Otherwise, his testimony as to the injury to Johnny is substantially the same as the state's prior witnesses. He did not see the child's body at the hospital or at funeral home. He further testified nobody threatened Seals, touched or beat him, and after the written statement was taken and signed he, and Mr. Hood, signed the same as witnesses.

The next witness for the state was Luscious Seals, the defendant's uncle. He testified that in January, 1947, when he first saw Johnny Williams Fails, the boy was fat. He further said that he visited in defendant's home practically every month during 1948. In June or July he was visiting in defendant's home and saw that Johnny was walking the floor from wall to wall. He was informed that Ernest made him do it. Later in the fall of 1948 he observed Johnny walking a beat in the yard while the rest of the children were playing. Johnny, he said, did not play or associate with the rest of the

children. Another time during the summer of 1948 he said Johnny was required to sit in one place in the grass in front of the house from 1:00 p.m., until a little while before sundown while the rest of the children played in the yard. He specifically said that Johnny was afraid of the defendant, and he recalled that the defendant always called the boy "dago".

Stanley Simon, who lived near the Seals during 1948, testified that he passed the Seals place two or three times a week and that practically every time he went by there the Fails child was walking a beat back and forth from the barn to the highway. This he first noticed in June of 1948 he testified. He further said he saw this as much as five times a week.

Ragan Holland, another witness for the state, testified he knew the Seals family. He said in 1948 he saw Johnny William Fails in front of the Oklahoma Theater in Hobart, Oklahoma. He said it was cool and he (Holland) had on a new leather coat, the first time he had worn it. The Seals family were in the barbershop and Johnny was outside in the car. Notwithstanding the condition of the weather, he said Johnny had on a pair of short pants and shirt, and no stockings or shoes. His face, Holland said, was all skinned up. The boy told him he had fallen off the porch. Prior to that time he said the child was a normal child. He testified, however, when he saw him at the Gish Funeral Home, the boy was all skinned up, and there were big black spots on the side of his head, and "the bottoms of his feet were full of thorns and sore". Moreover, he said the boy had a knot or blue spot in his groin; the scrotum had a hole in it, and his lips were skinned and his eyes were black, as was the side of his face.

Dr. J. P. Braun was then called as a witness for the state. He testified that he saw the Fails boy in the general hospital before he died, and also after his death at the Gish Funeral Home. Further, he said with the aid of Dr. Shriner, he performed an autopsy. This autopsy he said disclosed the child died of an intracranial or subdural hemorrhage. He described this type of hemorrhage as being right under the skull, between the skull and the brain and diffuse in character. He identified Exhibits 1, 2 and 3 as being a fair representation of the child's wounds. He said the child was emaciated, undernourished and had generalized black and blue spots all over his body He said he found no swelling or knot on the child's head where he was supposed to have struck the concrete in his fall against the door jamb. Moreover, he explained that if the child's head had struck the concrete he would expect to find a bruise, knot or swelling at that point. He said the child was nearly dead, meaning even before the alleged injury. The scrotum was slit and his feet full of stickers. He further said in substance the boy's undernourished and general condition would make him weaker and less able to withstand the blow. In relation to whether the child could eat like other children, he said Johnny was fully capable of partaking of any food he could get. On cross-examination he said this type of hemorrhage could have been caused by a fall. He explained it would have to be a very light blow without causing a little bruise. He said he found bruises on the face, around the right eye. These however, he testified could have been caused by a fall. The injury to the scrotum could have been caused by a fall against the barb wire fence he testified. The hemorrhage in this case, the doctor said, might have been a slow hemorrhage, and produced by a light fall. On re-

direct examination, however, the doctor swore if given the history of this child having been struck down and thereupon having become unconscious, he would assume that was what caused the intracranial hemorrhage. Theretofore he had been given no such history by the defendant he said.

The next witness for the state was Bill Long. He testified as to the child's poor condition and the bruises on his body and stickers in his feet. He had never known the child prior to seeing his body at the Gish Funeral Home.

Buster Watkins, a member of the coroner's jury, testified for the state and his testimony differs little from that of Bill Long's.

Mrs. Hoyt Wales testified that the Seals family pulled bolls for them on Friday and Saturday late in October. Johnny she said was with them and was so inappropriately dressed, that when she found him Saturday he was almost frozen. This was objected to and the defendant moved it be stricken, as well as other testimony regarding the child soiling his pants and no change being made of them from Friday to Saturday. The court overruled the objection and motion.

Mr. M. J. Henthorn was then called as a witness for the state. He testified during 1940 he lived about 200 feet north of the Seals property. He moved from this location in February, 1948. He said he knew all of the Seals family including the Fails boy. He said he had seen the Fails child during July and August of 1948 walking back and forth east of the house, between it and the single garage. To this evidence objection was made, overruled, with exceptions. During this time he said he saw the boy walking this beat 20 or 25 times, sometimes

he said the boy would run instead of walking. He testified one Sunday Lester Blevins visited at the Henthorn home and observed the conduct of the Fails boy walking his beat. When Mr. Seals came home he testified, the other children would run to meet him and that little Johnny Fails would run to his beat and start walking back and forth if not already engaged in walking the same. This beat walking was so regular he just didn't watch it any more. The Sunday Mr. Blevins was at the Henthorn home the child walked the beat all day. On this day he said the walking started early in the morning and continued until it was so dark he could not see. One time the child relieved himself under a tree, and Seals came out and beat him with a half inch rope 10 or 12 licks. He further testified the child cleaned up the mess with a shovel he got out of the garage, washed it, put it back and then started walking again. Moreover, he related on another occasion he had seen the child not only whipped but kicked by the defendant. In fact, he testified, the child would go down to the milk barn when the defendant went to milk and walk the beat between the milk barn and shed. On these occasions he swore that when the defendant came out of the barn and the child was at that end of the beat Seals would kick him. This happened under his observation four or five times he said. Furthermore, he testified the child never wore any shoes. In addition thereto, he stated the child's "face was always skinned up". Objection was made to this testimony, a motion to strike interposed, overruled, with exceptions.

Dr. Richard F. Shriner testified for the state, giving substantially the same evidence as Dr. Braun, with substantially the same conclusions. Dr. Shriner said he assisted Dr. Braun at the autopsy. In addition he said

they found no break in the skin of the head at the point where the child was supposed to have struck the concrete sill. He said he would expect to find a break at the point where the head came in contact with the rough surface. Moreover he stated the broken and scabbed over places on the lips could have been due to severely chapped lips. He stated that having been given a history of the child having received a blow from the defendant immediately preceding the hemorrhage it would be his conclusion that the blow would be the cause of the hemorrhage and the resulting death, and not a fall some three hours or three weeks preceding the blow. He said a blow on the head from a smooth surface or on a smooth surface left a knot and a bruise. In addition he even testified it was his opinion such a surface as was pictured in Exhibit 3, the concrete door sill, would produce some type of abrasion.

Mr. Leon Jennings, sheriff of Kiowa county, said he was present at the jail when Seals was questioned on November 29 and 30, 1948. His testimony in relating how the killing occurred was substantially the same as the other officers, as was his evidence in relation to the questioning of the defendant. Moreover, his testimony differs little from that of the other officers as to the defendant's attitude and manner of confessing, and as to what he said in the confession itself. He said the defendant stated he did not intend to kill the boy when he hit him. He further testified he viewed the child's body at the funeral home which he described in substantially the same terms as the other officers, and witnesses who viewed Johnny Fails body.

Lester Blevins, to whom reference has heretofore been made, was the next witness for the state. He stated he had visited the Henthorn home on a Sunday in July, ar-

riving about 9:00 a.m., and staying until about 5:00 p.m., and during this time, except for a short while at noon, he saw the Fails boy walking the beat as heretofore related by Mr. Henthorn. At this juncture in the trial the state rested its case, the defendant demurred which was by the trial court overruled and excepted to by the defendant.

The first witness for the defense was Mrs. Ernest Seals. She swore that she and the defendant were married on October 20, 1946, at Ardmore, Okla., and that she had been married prior thereto. She testified that at that time she then had a son born out of wedlock, Johnny William Fails, the victim of the crime herein alleged. At the time of the marriage she said Johnny was living with her parents 38 miles from Knoxville, Tenn. She said Ernest had four children by a previous marriage which children were then kept at the Tipton Orphans Home; all these children, together with her Johnny Fails, were united in the matrimonial union. Thereafter she said she gave birth to another baby. She said all six children were treated just alike as to food and clothing. She related that Johnny was subject to falling. In fact, she said he fell off the porch about two weeks before the commission of the alleged crime herein involved. He "sorta" knocked himself unconscious at the time he fell from the porch, she said, and was carried into the house and Ernest revived him. The children all played in the yard, and had the same toys and received the same treatment and that Johnny was spanked just like the other children when he needed it, she related. She said they all went to Sunday School pretty regularly, attending the First Baptist Church in Hobart, Okla. She said Johnny walked in the yard quite a bit. She explained he did this in Tennessee before coming to Okla-

homa. She testified she never heard Ernest tell him to walk the beat either in the house or in the yard. As to the events on November 23, 1948, she said that in the evening Ernest Seals and the three boys went to the barn to milk. Shortly thereafter Ernest came rushing in with Johnny, laid him on the divan, and told her to wash his face. She did wash Johnny's face, and about that time Ernest came back from the milk house and took them to the hospital. She stated Ernest drove as fast as he could. She testified that she stayed at the hospital all night and Ernest went home to the other children. She further swore Johnny came in several days before with his pants torn and a slit in his scrotum which she said he told her he got while crawling through a barb wire fence. Ernest knew nothing of this injury, she stated. Cross-examination elicited nothing of importance. On re-direct evidence she further testified that Johnny had three pairs of shoes and was wearing shoes when he was taken to the hospital. They took them off there she said. Three pairs of shoes were offered in evidence as being Johnny Fails' shoes. She further testified about Johnny soiling his trousers over at the Wales place where they were pulling bolls but she said she changed his clothes for him. Moreover she related that on occasions she picked stickers out of Johnny's feet. She contended the sores on his feet were from going barefoot. She admitted Ernest spanked Johnny with a light switch for using the yard instead of going to the toilet, but denied he was beaten as testified to by Mr. Henthorn. In addition thereto, she said Johnny's nose bled frequently. She related that Johnny was a prankster which caused him to get spanked on occasions. Then she said Ernest spanked all of the children just alike. Ernest seemed to think just as much of Johnny as he did his own children, she

stated. Johnny was fat the first year and a half he lived with them, but then his teeth began to decay and he started going down hill, she explained. However, she said he was in fairly good health the past summer. That was the summer preceding the alleged crime. Next she identified some kodak pictures of the family in a happier mood, all together picnicking. She said her husband was gone most of the time, from early to late working. Upon re-cross-examination, she testified that she cut Johnny's hair, that was the reason Mr. Holland saw him in the automobile alone in front of the barbershop, while the Seals children were inside getting a barbershop haircut. Then, she said she only cut his hair one time, the rest of the time Johnny went to the barbershop with the other children. She admitted, she had talked to people at the hospital following the slapping of Johnny and his injury. She didn't remember who they were or what she said to them, because she was so scared. She refuted the statement that she told them Seals denied Johnny food, and threatened to whip her for giving it to him, and that he had whipped Johnny every day since she and Seals were married, that he whipped Johnny for anything and everything. She did not deny that Johnny walked the beat in the yard. She denied she told the prosecutor and deputy sheriff Adams that on November 24, she told them she did not love Ernest Seals like she did, and that Seals mistreated Johnny all of the time. In response to whether she told them Seals beat Johnny with a strap she said "I didn't say he beat him. I said he whipped him". She denied Mr. Henthorn's evidence that Seals whipped Johnny with a rope. Likewise, she denied telling Ranson Hancock, Blanch Neuwirth and Rosa Harrison that Ernest Seals starved and beat Johnny Fails. She admitted Luscious Seals', the defendant's uncle, in-

quiry as to why Johnny walked from wall to wall inside of the house, but said she told him it was a habit of the boy, and denied telling Luscious that Ernest required it as punishment. She did not recall Luscious telling Ernest Seals he should be ashamed of himself for it. She stated she did not tell John Adams if this child died she would leave Ernest Seals. She contended she did not voluntarily tell Rosa Harrison, at the hospital, the slit in Johnny's scrotum was produced by a pen-knife in Ernest Seals' hands. (It is well we note this point was not alluded to in rebuttal testimony.) She denied saying she told the hospital authorities that her husband complained that Johnny ate more than all of his children. Likewise, she denied telling Blanch Neuwirth that Ernest Seals beat Johnny with a leather strap, exhibited in evidence, "to the extent that he knocked the child to the ground when he hit him". She further stated that she **never told Mr. and Mrs. Holland** that Seals beat Johnny unmercifully and starved him, and that they suggested she send the chlid back to her father's home in Tennessee. She admitted having conversations with Miss Neuwirth, and with the nurses at the hospital the night she stayed with Johnny. She stated though Johnny became poor she never had a doctor with him. Other evidence of little consequence was elicited from Mrs. Seals.

Next the defense produced as a witness C. A. Gibbs, Jr., who attempted to testify as to the defendant's general reputation in Sweetwater, Tex., and around Hobart, Okla. In this connection he admitted he never talked to anyone about Seals' reputation and stated his evidence was based upon purely personal knowledge and not the defendant's reputation in the communities where he had resided.

Ray Belding was the defendant's next witness. Belding testified Ernest Seals worked for him during 1947 and 1948 doing general farm work. Occasionally he came in contact with the Seals family he said. He testified Seals was of good reputation and was law-abiding and peaceful. He too, however, said he had never heard this man's reputation discussed and based his testimony solely upon his own opinion as a result of Seals' work record and of his conduct with him. He said he viewed the child's body at the Gish Funeral Home, and though he had observed the family he did not know this was going on (apparently referring to the bruised condition of Johnny's body).

Mr. Joe Taylor was then called by the defense. He stated he was Joe Belding's father-in-law. He said he had known the defendant approximately two years. During this time he was at the Seals' place on several occasions though he was never in the house. He stated Seals treated the children all alike, and that he was of good reputation. But on cross-examination he said his opinion as to his reputation for being peaceable and law-abiding was a matter of his own personal opinion and not as to what he had heard people say about him. He admitted seeing the child walking the beat in the yard on occasions and said that none of the other children ever did this.

The next witness called by the defendant was Ernestine Seals, the defendant's own 11-year old daughter. She stated she understood the significance of an oath. She related that little Johnny had the same food and kind of treatment accorded all the other children in the family. Her father, she said, spanked Johnny whenever he needed correction, that Johnny walked in the yard but her daddy never told him to do so, she contended. She tes-

tified she saw Johnny fall off the porch, and also saw him fall when crawling through the barbwire fence the time he tore his pants on the wire. She pointed out that Johnny had shoes like all the rest of the children and went barefoot in the summer like the others did, and at Christmas got the same amount of toys as the other children. On cross-examination, she said no one had ever talked to her, not even her mother, about this case. Finally, on recross-examination, she said her mother did say to her that she never told Johnny to walk, and she knew daddy didn't either. Moreover, she said Johnny ate the same kind of food the other children did, and had no trouble eating it.

Dolores Seals, the 9-year old daughter of the defendant, was then presented as a defense witness. She too understood the meaning of an oath to tell the truth. She said she had shoes, but went barefoot like the rest of the children in the summer time. Johnny had the same kind and quantity of food as the other children she related. He got spanked like the rest of them when he needed it, she said. On cross-examination she admitted she had seen Johnny walking in the yard but she never heard anyone tell him to do it. She stated she saw Johnny fall off the porch, and also fall when crawling through the barbwire fence. Both her father and mother treated the children alike, she swore. Since Johnny's death, she stated, her mother and her brother had never talked to her about Johnny's death. She testified Johnny had no difficulty in eating the same food the other children did.

Eddie Seals, the defendant's 8-year old son, was called as a witness. He too knew the meaning of an oath, he said. He stated he remembered little Johnny. He testified they all ate at the same table and all had the

same food. He related his daddy spanked Johnny and him when they didn't mind. He also remembered Johnny getting hurt when his daddy was milking. He said they were playing on bales of hay at the time. He testified his daddy did not slap Johnny but said Johnny fell against the concrete, and then his father picked Johnny up and took him into the house, and later took Johnny and his mother to the hospital. He said he had seen Johnny walking in the yard, but said neither his daddy nor his mother ever told him to do it. He testified Johnny fell once before, crawling through a fence. On cross-examination he said one other time Johnny fell on the concrete. He admitted telling Mr. Cunningham, counsel for the state, that Johnny fell on a rock in the lot, but said he did not know why he told him that. He said Johnny ate lots of meat. First, he testified he did not know if his father ever whipped Johnny with a belt, then stated that he whipped him with a belt and some times with his hands. He said he had never talked to his mother about the case, finally he said he did not know how many times she had talked to him about it.

Phil Blackwelder, appearing for the defendant, testified that in October, 1948, he and his mother were at the Seals' place on business to check the buildings for repairs. He said during October, 1948, they were at the Seals' place twice, during all of which time he never saw any untoward acts manifested against the child. On cross-examination he said he would not know whether Seals abused Johnny Fails.

Ernest Seals then testified in his own behalf. In substance, he testified he was 37 years of age, without education, going only past the primer and the first grade in school. He said his ability to write was confined to signing his name only. He related his occupation was

that of a common laborer and painter. In the summer time, in the wheat harvest and haying time, he said, he worked from 6:00 a.m., until as late as 1:00 or 2:00 a.m. He testified about the size, and status of his family, both before and after his marriage to Johnny Fails' mother, substantially as hereinbefore related. He testified he loved little Johnny just as he did his own children, and treated him as he did his own boy, buying the same gifts at Christmas time. He said that if he had not been glad to get the boy he would not have driven so far to bring him to Oklahoma. He related he fed Johnny just as he did the other children. He said he spanked him just like he did the other children, when he needed correcting, admitting he used either a belt or his hand. He denied he ever made Johnny walk up and down the yard, but admitted Johnny did so often, but stated he did not know why. He related that at Christmas time he bought stick horses, toy guns and scabbards and the boys began to play cowboys, and pretty soon Johnny laid down his and began walking. He stated he often went for groceries and took the boys with him and bought them candy and popsicles, including Johnny. The children all went barefoot in the summer time, he said. He stated he had often picked stickers out of Johnny's feet, but on the day he was wounded he had on shoes. He denied ever whipping Johnny with a rope, but did admit whipping him with a switch four or five licks, when he excused himself in the yard. He stated he did make the boy sit down at Luscious Seals' house one afternoon, but denied he confined this order to Johnny Fails. He stated Johnny had bad teeth and indicated, for this reason, he could not eat as much as the other children. He testified Johnny was always stumbling or falling down. He recounted that a week or a week and a half before the fatal in-

jury he saw Johnny lying in the yard. He had fallen off the porch. He went out and brought him into the house and told his wife to get a rag and bathe his face. As to the events on November 23, he went to the barn to milk and his boys went with him, and Johnny came in later. He had been milking for a little while, he said, and Johnny came in. His testimony relating what occurred in the barn is quoted from the record as follows:

"* * * I was sitting there milking when he run up to the cow, I don't know, he made the cow kick, pulled her tail or something; I was facing north, I was sitting on a two gallon bucket and I grabbed the milk bucket— Q. You say he did something to make the cow kick? A. Yes, he either punched her or pulled her tail and I turned around and said, 'son, don't make the cow kick and spill the milk and daddy won't have any milk for his babies', and he came on around and I was talking— Q. Just tell what happened. A. He was standing behind the cow while I was milking, and I said, 'son, don't bother the cow while I'm milking', and he didn't say nothing, and I kinda pushed him. Q. You slapped him with your open hand? A. Yes, sir, with my open hand like that (indicating); not hard; in fact, he turned around and started back out, and I figured he was going back to the house, he had just come from the house my wife told me, and I went back to milking. I slapped him with this hand; and I went back to milking and I was facing the north and I looked over there and little Johnny was lying at the door; he had stumbled and fell; he was laying on his stomach on the ground inside the barn. Q. Was his head inside this foundation in the doorway? A. Yes, sir, inside. Q. What did you do then? A. Well, I was scared; I jumped up and carried him to the house and I laid him on the divan, and I said, 'Honey, get a rag and let's bathe little Johnny's face; he fell in the milk lot; and she run and got a pan of water and I stood there; I had laid him on the divan, and he was gasping, like he was gasping for breath, and I said, 'Honey, I didn't

get through milking and I will run and get the milk and be right back, and I ran then, hurried and started to milk and Eddie, my oldest boy, was trying to milk. I heard the car start about the time I sat down, and I said that little Johnny must be dying or Doris wouldn't be getting the car out and I jumped up then and went to the house and when I got to the house with the milk she had the car run out of the garage and brought up there, and I told her to set in the back seat and hold little Johnny and I would drive, and I had a '37 Willis—and she got in the back seat and held him and I threw it wide open and took him to the hospital about sixty miles an hour—that's as fast as it will run."

He related that he stayed at the hospital until 8 or 8:30 and then returned home to be with the other children while Mrs. Seals stayed at the hospital with Johnny. He admitted telling the doctor at the hospital how Johnny got hurt. He said he also related that Johnny had a habit of falling. Further, he stated Johnny was afflicted with nose bleed. He asserted when he slapped Johnny he had no intention of hurting him, "I did not want him to die and had never wanted to kill him". Likewise, he denied telling anyone he hated Johnny and did not like him, in fact, he stated he loved Johnny. He denied telling several officers, who questioned him, he struck Johnny down. He said the officers questioned him about four hours until he signed a statement he could not read. The county attorney and deputy sheriff Marlar and other people were there he related. He denied referring to Johnny as a little bastard as sworn to by Mr. Adams, the undersheriff and Mr. Taylor. He said when the undertaker asked his wife what Johnny's name was she wouldn't answer, and he told him she said Johnny didn't have any father. He said Mr. Hood told the undertaker he was a little bastard and "I said I guess that is what you would call it". He admitted referring

to Johnny as "dago" but said he called his own children by nicknames, Junior "little Indian" and Eddie "little Irishman". He said the officers accused him " 'Did you get a little knife and casterate that kid', and I said, no, sir, I haven't touched that kid, and they said his little bag was cut, and I said I didn't do it, and I said that he done that going through the fence". On cross-examination he denied the testimony of Mr. Henthorn and Mr. Blevins that the evacuation incident in the yard by Johnny occurred on Sunday. He said it was on a work day and not on Sunday. In this connection he could not say how long Johnny walked back and forth on his beat on work days because he himself worked. On Sundays he said he only walked part of the time and he would play a while and then walk awhile. Seals testified that he himself was five feet nine inches tall, and weighed 198 pounds. He admitted telling the doctor at the hospital that Johnny just fell out in the milk lot. He said he didn't know why he told him that. He admitted that when the officers first began to question him he denied slapping Johnny and stated he did not tell him the truth to begin with. He denied Johnny's teeth were so bad he could not eat meat, but to the contrary, he ate meat and anything we had to eat. He denied calling for a Bible at the time of his confession, stating that a grey-haired man and Jim Marlar brought in the Bible and asked him to put his hand on the Bible and tell them the truth, then he told them he slapped Johnny and Johnny turned and fell. He said the reason he didn't tell the truth the first time, "there were too many over there, * * * too many fingers in my face." On redirect examination and cross-examination his testimony was repetitious and of no material consequence. The defense then rested.

Thereafter, the state called several rebuttal witnesses. The first was Rosa Harrison, a nurse at the Hobart General Hospital. She stated she was working at the hospital on November 23 and 24 of November, 1948, during which time she talked with Mrs. Seals about Ernest Seals' treatment of Johnny. She said Mrs. Seals told her Ernest gave his own children more to eat than he would Johnny, and that he whipped Johnny practically every day taking off his belt which he used for that purpose. She stated that Mrs. Seals stated the child was afraid of the defendant, and that the beatings had been growing worse ever since they got Johnny. On cross-examination she said Mrs. Seals stated he never mistreated his own children. Moreover, she related Mrs. Seals said, that the defendant threatened to whip her, if he found out about her feeding Johnny between meals.

Blanch Neuwirth, another nurse at the same hospital, testified she too talked to Mrs. Seals on November 23, 1948. She said Mrs. Seals related that Seals did not give Johnny enough to eat, and whipped him most every day. She recounted that Mrs. Seals said she was afraid to feed him between meals, because Seals threatened to whip both of them, if he found out about it. She said Mrs. Seals said Ernest beat the child with a leather belt, hitting Johnny so hard it would knock him down. On cross-examination she testified Mrs. Seals said she was scared and upset. She also testified Mrs. Seals said that Ernest Seals was good to his own children.

Ranson Hancock, a newspaper editor and publisher, appearing for the state in rebuttal, testified substantially as follows: He stated that he first met Mrs. Seals on November 24, 1948, and at which time he inquired as to why Johnny was so emaciated, and she told him he did not eat enough, "he was scared of his daddy." Later

at the home he said Mrs. Seals produced a strap, with which she said Johnny had been whipped. He further said Mrs. Seals told him she did not feed the boy between meals for the reason "I'm afraid to, my husband said he would whip me and the boy too, if he found out I had fed the boy". Moreover, she was quoted by Hancock as saying, he fed all of his own children all they wanted to eat but he gave Johnny only what he wanted him to have, and that if Johnny died that she would not live with Seals any more. On cross-examination he admitted Mrs. Seals appeared worried and upset when he talked to her.

Sheriff Leon Jennings testified in rebuttal in substance as follows: That the defendant did call for a Bible notwithstanding his denial to the contrary. Moreover, he stated that Seals was told he could have an attorney, but the offer was declined and the statement made that he did not need any. He denied there was any poking of fingers in the defendant's face. On cross-examination, it was elicited from him that he was not in the cell when Seals asked for the Bible, but he did hear Tad Shriner reading from it to him, and it was then taken back to the cell of the man to whom it belonged. Later, however, he related, Seals asked for it again and laid it down and with his hand on it said "I am going to tell the truth". Sheriff Jennings further testified Carpenter Hughes told Seals he could have an attorney, and Seals said he knew Mr. Finis Gillespie who had helped him get his children out of the Orphans Home, but Seals stated he did not need any lawyer.

Deputy Sheriff John Adams next appeared in the array of witnesses for the state. He denied they put their fingers in Seals' face. He said he was there when Seals called for a Bible immediately preceding the con-

fession, but he was not present when Tad Shriner read to him from the Bible, and that he did not know the Bible had been used before the defendant called for it and made his statement.

Jim Marlar, deputy sheriff, also testified in rebuttal. He said he twice brought the Bible up to the cell where Seals was questioned. On cross-examination, he said the first time Seals did not call for it. That was when Shriner read from it to him. He denied fingers were stuck at Seals in the questioning. On redirect examination he related that he did not hear Seals told he could have an attorney, and that he never heard Seals mention Mr. Gillespie's name. Further he said that Seals told the county attorney he did not want a lawyer, and the county attorney told Seals he would not promise him anything.

Deputy sheriff O. E. Peters' testimony was in substance the same as that of the officers that preceded him in rebuttal.

T. J. Shriner, owner and operator of a radio station at Hobart, Oklahoma, in rebuttal, said he was not present when Seals asked for a Bible.

Tad Shriner, cotton compress superintendent, in Hobart, Oklahoma, stated in rebuttal, that he was in the cell with Seals in March, 1948, and that he brought the Bible into the cell and quoted excerpts from it to Seals. He also stated he was there when Seals requested it be brought in again. He related that Seals put the Bible on his leg and his hand on the Bible, and said he was going to tell the truth, and then made his statement.

Ragan Holland was then called, and his evidence was repetitious to the effect that the boy ate and did eat meat

at his home, and apparently there was nothing wrong with his teeth.

Mrs. Lela Holland, wife of Ragan Holland, confirmed her husband's testimony, that the Fails child ate everything she gave him including fruits, steaks sandwiches and lunch meats. In response to the question "Did he appear hungry", she answered, "he would always eat and apparently had no difficulty in eating".

Alvina Adams, newspaper reporter of Hobart, Oklahoma, went to the hospital with Ranson Hancock on November 24, 1948. She said Mrs. Seals told them that Johnny did not get enough to eat, and that Seals whipped him so much that was the reason for Johnny's poor appearance.

Thereupon the state rested and the defendant requested a directed verdict, which was by the trial court overruled.

The first proposition urged by the defendant on this record is that the state wholly failed to prove the numerous offenses charged in the information or any offense punishable by the laws of the State of Oklahoma, and that it was error for the court not to sustain his motion for an instructed verdict. In support of this theory, the defendant relies upon the provisions of Title 22 O.S. 1941 § 850, as follows:

"If, at any time after the evidence on either side is closed, the court deem it insufficient to warrant a conviction, it may advise the jury to acquit the defendant. But the jury are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict."

In support of his position he cites the following cases, Freeman v. State, 69 Okla. Cr. 164, 101 P. 2d 653; Mc-

Carthy v. State, 6 Okla. Cr. 483, 119 P. 1020; and Brady v. State, 57 Okla. Cr. 203, 46 P. 2d 963, 964, wherein the court said:

"The general rule is, where evidence is circumstantial, the facts shown must not only be consistent with and point to the guilt of the defendant, but must be inconsistent with his innocence. Carefully considering the competent testimony in the case, we are clearly of the opinion that the verdict is contrary to law and the evidence, and for that reason the trial court should have sustained the motion of the defendant for acquittal. The judgment therefore is reversed."

The principle announced in all the foregoing cases is substantially the same, and certainly is sound, but are not controlling. They are not applicable for the reason that the cases relied upon depend upon the assumption that the state's evidence entirely fails to incriminate the defendant. To so hold, in this instance, would require the court to close its eyes to the long chain of abuses to which the defendant subjected Johnny Fails, during the time he resided with the defendant before Johnny's death. In this connection the record speaks in resounding tones of the determined course of starvation, evidenced by the photographic exhibits of the emaciated body of Johnny Fails, confirmed by the statement of Dr. Braun, that the child was nearly dead from the lack of nourishment before the events that occurred on November 23, 1948, in the milkshed. Likewise it was buttressed by the evidence of neighbors Mr. and Mrs. Holland as to the boy's hunger as well as Mrs. Seals' statements to the nurses, radio and newspaper representatives, that Johnny was not permitted to eat like the other children did. Moreover, the photographs, and the evidence of the doctors and numerous lay witnesses, offer conclusive proof of evidence of beatings both past and immediate. Seals'

uncontradicted evidence of neglect found in the festered feet of the victim, punctured and suffering from goathead thorns, offers ample evidence that the boy had been barefoot even in the wintertime. These evident acts of barbarous brutality, when considered in the light of the statements made by Mrs. Seals that she was afraid to feed the child, lest she herself be beaten, presents a picture of a perverted and premeditated design to abuse Johnny Fails. This evidence, when considered in light of the proof of beatings, exhaustive walking and general neglect, culminating in an outburst of passion and the admitted final blow administered when Johnny Fails pulled the cow's tail (if he in fact pulled the cow's tail), present a sufficient chain of circumstances on which the jury could and did find the defendant guilty beyond a reasonable doubt. On the other hand, the chain of circumstances offered by the defendant and his wife, unsupported by unbiased corroboration, to the effect that Johnny was susceptible to nosebleed and to falls which would produce an intracranial hemorrhage, and that he had fallen off the porch about a week and a half before the alleged crime, and fallen when climbing through a fence, all of which when considered in the light of the doctors' testimony, that a slight fall and blow to the head could have produced a slow hemorrhage due to the fact of his weakened condition, would constitute a sufficient basis for a finding of not guilty if believed by the jury. But the extent of the evidence of the state is sufficiently strong that if the jury desired to believe it they could find the defendant's guilt inconsistent with any other hypothesis other than guilt, Hicks v. State, 70 Okla. Cr. 284, 106 P. 2d 136, relied on by the defendant to support his theory. Certainly an examination of this case and the law therein announced does not support

the defendant's theory but instead supports the theory of the state. ·We quote:

"Where the evidence against the defendant is wholly circumstantial, the circumstances proved must not only be consistent with each other, but consistent with the defendant's guilt and inconsistent with any other reasonable hypothesis other than his guilt.

"Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing.

"Where the defendant is charged with the murder of his wife by striking and kicking her in the back and side, causing injuries which resulted in death, while the defendant and the deceased were walking after dark down a path by themselves, and the physical facts with relation to the location of the injuries on deceased and the situation of the ground where the death occurred contradict the statement of the defendant as to how the death occurred, the jury may treat that as a strong circumstance tending to prove the guilt of the defendant; and where these facts, together with the other facts or circumstances showing the relationship of the parties prior to the alleged homicide, tend to prove defendant's guilt, the same will be sufficient to support a verdict of conviction."

An analysis of the facts in the Hicks case, supra, discloses a marked similarity to the situation confronting the court in the case at bar. It is well to note that the judgment in the Hicks case was affirmed in face of substantially the same contentions as are made by the defendant in the case at bar. We believe that, when considered in light of Dr. Braun's testimony, that if the child was struck down and immediately thereafter became unconscious as a result of intracranial hemorrhage, he would conclude the hemorrhage was the result of be-

ing struck down, and supported as this conclusion is, by the doctor's further statement that the boy's body had generalized black and bruised spots on it, and the defendant's admission that he whipped the boy and that the boy did not eat like the other children, and that the boy did walk a beat as testified to by neighbors and visitors, we hardly see how a jury could have reached any other conclusion than that of the defendant's guilt. It thus appears that the defendant's long overdue retribution caught up with him in the death of this unfortunate, unwanted offspring, born out of wedlock. But in any event the issue was one for the jury as was said in Plemons v. State, 53 Okla. Cr. 263, 10 P. 2d 285, 286:

"Trial courts in Oklahoma are limited in their power to interfere with the determination of issues of fact; and, where there are any facts from which the jury can legitimately deduce either of two conclusions, a motion to advise the verdict should always be denied, and the question of fact properly submitted under instructions given."

Also, to the same effect is Radke v. State, 17 Okla. Cr. 230, 187 P. 500:

"Where there are facts from which the jury can legitimately deduce either of two conclusions, a motion for a directed verdict should always be denied."

And Davis v. State, 15 Okla. Cr. 386, 177 P. 621, and Swift v. State, 92 Okla. Cr. 43, 220 P. 2d 300, our latest expression thereon, to the effect that where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts. Under the conditions herewith presented, it was not error for the trial court to refuse the request for a directed verdict.

The defendant's second contention is that it was error for the trial court to permit evidence of prior mis-

treatment by the defendant of Johnny Fails. With this contention we cannot agree. Hicks v. State, supra, and Jackson v. State, 84 Okla. Cr. 138, 172 P. 2d 924. Moreover a case strongly supporting the state's contention of the admissibility of this evidence is that of People v. Thiede, 11 Utah 241, 39 P. 837, a case of wife murder wherein it was said:

"Where, in a prosecution for uxoricide, there is direct evidence that defendant continuously maltreated deceased, witnesses may testify to having heard deceased screaming at her house, to having seen bruises on her face and body, to having observed her when she appeared alarmed and frightened, without further evidence connecting defendant with acts of cruelty towards her, causing her to scream, etc."

And in the body of the opinion, the court said in part:

"It is insisted that the court erred in admitting incompetent, irrelevant, immaterial, and hearsay evidence:

"(a) In permitting certain witnesses to testify to hearing deceased scream upon numerous occasions, to seeing bruises upon her face and body, to seeing her cry upon several occasions, and to observing her when she appeared alarmed and frightened,—without connecting the defendant with the circumstances, or the alleged acts of cruelty towards the deceased. It is conceded by defendant's counsel that 'in cases of marital homicide ill treatment and abuse by the husband to his wife may be shown in a general way for the purpose of proving malice or motive, but it is incompetent for any other purpose.' It is evident from the record that the sole purpose for which this testimony was offered was to show defendant's malice towards his wife, and point out the motive for the homicide. Psychic phenomena so often appear that scientists sometimes despair in their efforts to trace ordinary and natural sequence in mental concepts. Still the accepted rule must be that motive underlies human action.

Uxoricide is unnatural. When it is charged, the first question suggested is, what motive inspired the deed? It is a most material question to be determined. If no reason or motive is found, one is loath to believe even positive and direct evidence incriminating the spouse. In the case at bar, evidence of kindness and affection towards the deceased, exhibited by the defendant, would have been material, and would have proven of great weight in his behalf; conversely, cruel treatment and evidence of hatred and ill will would weigh very strongly against him. Various witnesses testified to maltreatment, and circumstances from which the prosecution sought to draw inferences that defendant's treatment of his wife was cruel and inhuman."

To the same effect is our own Hicks v. State, supra. This evidence was admissible as tending to show malice and ill will toward Johnny Fails. Similarly, as was said in the Thiede case, continued abuse of a child five years of age is most unnatural. Evidence of kind treatment, love and affection of the defendant toward Johnny Fails would certainly have been material and of great weight in the defendant's behalf. But substantially no such evidence could be found for him. So also evidence of ill will, mistreatment and abuse should weigh heavily against the defendant. Here many witnesses testified as to long and continued inhuman abuses of Johnny Fails by the defendant, which formed the foundation upon which the jury could draw a logical inference of cruel and inhuman treatment, resulting in Johnny Fails' death. The defendant's inhumanity under these conditions certainly would not be consonant with kindness, but under an extraordinary situation, would be designed to provoke greater cruelty. It often happens that when affirmative proof is not available and only circumstantial evidence points to the defendant's guilt, quite naturally the jury, seeing the reflection of the defendant mirrored in his past, con-

firms his guilt, where otherwise he would escape the just penalties of the law. Under these conditions, it is another example of the "moving finger writes and moves on, and all your piety and wit cannot erase a line of it, nor all your tears wash out a word of it". Hence the evidence of the defendant's attitude towards Johnny William Fails, under the circumstances of this case, was clearly admissible as a factor in tipping the scales of justice against the defendant.

The defendant's third contention is that the court erred in admitting in evidence photographs of the dead body of Johnny William Fails, Exhibits 1, 2 and 3, showing the bruised, scarred and emaciated condition of Johnny Fails at the time of his death, as evidence of his past mistreatment. The defendant contends that they were not admitted in good faith nor for any legitimate legal reason, but were offered for the sole and only purpose to confuse and mislead and prejudice the jury. With this contention we cannot agree, especially in light of the admissible and sworn evidence of the prior mistreatment and abuse of the defendant toward Johnny Fails, which appears in Exhibits 1, 2 and 3. Under these conditions confronting the court it was entirely appropriate to permit the introduction of said photographs in evidence as corroborative of the sworn testimony of neighbors and others as to the mistreatment accorded Johnny, and as corroborative of the sworn testimony of the several witnesses, who viewed his body in the hospital before his death and in the funeral home following his demise. In keeping with an old Chinese proverb, in this instance "one picture was worth a thousand words". In these photographs Johnny's emaciated and impoverished body looks like he might have been a victim of the Buchenwald Concentration camp, instituted by the perverted brain of

Adolph Hitler during World War II and maintained under his direction for the persecution and slow death of his enemies. Certainly these photographs offered graphic evidence of a warped and devilish attitude of Seals towards Johnny Fails. They constitute positive confirmation of the sworn evidence, and were most material as a faithful representation of what they purported to depict. In Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981, 982, it was said:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places."

To the same effect is Roberts v. State, 82 Okla. Cr. 75, 166 P. 2d 111; Langley v. State, 90 Okla. Cr. 310, 213 P. 2d 886.

The fourth proposition urged by the defendant is that the trial court erred in its instructions to the jury, and in refusing defendant's requested instructions. In this connection the defendant complains that instruction No. 4 defines excusable homicide in the language of the statute. The defendant says the second part of the statute, Title 21, § 731, O.S. 1941, is not applicable to the case at bar in that such portion which relates to sudden combat, killing by the use of a dangerous weapon, or killing in the heat of passion or where the killing is done in a cruel and unusual manner, did not pertain to the issues herein involved. Certainly, this portion of the instruction standing alone had no applicability, but instruction No. 4 was explained and limited in instruction No. 5, which reads as follows, to wit:

"Excusable homicide, insofar as it affects this case, is homicide committed by accident and misfortune, in

doing a lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent."

Thus is appears that the second part of the statute constitutes mere surplusage under the circumstances herein involved. While it would have been better under the conditions for the trial court not to have included the second section of the statute because of its inapplicability in instruction No. 4, its inclusion in light of the apparent limitation contained in instruction No. 5 constitutes at most nothing more than harmless error. T. 22, § 1068, O.S. 1941. The foregoing constitutes the only contention as to erroneous instructions we deem to be of any substantial merit, and the only instruction concerning which the defendant points out any specific objection. (His complaint with reference to the other instructions are that they were garbled and misleading.) Otherwise, the court's instructions were substantial statements of the law as applied to the facts in the case. It suffices to say that the defense herein under the admitted evidence was excusable homicide or unavoidable death not contributed to by defendant, both of which defenses were adequately, if not, artfully covered in the court's instructions 4, 5 and 8, a substantial statement of the law as applied to the defendant's defense. The defendant's requested instructions would have added nothing in this regard.

The defendant's fifth proposition is to the effect that the county attorney committed reversible error in his closing argument in holding up, to the attention of the jury, the written statement purportedly signed by the defendant which had never been introduced in evidence by the state, but to which repeated reference had been made during the trial without objection. After the argument was concluded the following record was made:

"By Mr. Gillespie: I would like for the record to show that the assistant county attorney referred to a statement by holding it up before the jury, which he had never introduced in evidence, and which was in his possession throughout the trial. By Mr. Cunningham: *I would like for the record to show that that was the same statement referred to in the testimony and in the evidence; and that the attorney made this statement: That the assistant county attorney refused to introduce the statement.*"

The foregoing record, and particularly that portion appearing in italics, discloses that counsel for the defendant in his argument apparently provoked a reference to the written statement. Furthermore, no portion of the claimed error is before us. All that appears is the afterthought of both counsel. The record is therefore insufficient upon which to base a finding of prejudicial error. Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817, 819:

"Ordinarily, error cannot be predicated on mere unexplained excerpts from remarks of counsel to the jury, but enough must appear to advise the appellate court of what preceded alleged objectionable statements and their meaning to be deduced from the context, and whether they were invited or provoked by opposing counsel's remarks." Gates v. State, 90 Okla. Cr. 380, 214 P. 2d 451.

Under the record herewith presented and the authorities applicable thereto, we find the judgment and sentence herein imposed is supported both by the law and the evidence, and the same is therefore accordingly affirmed.

JONES, P. J., and POWELL, J., concur.