## SANDERS v. STATE.

No. A-11827. Dec. 9, 1953.

(264 P. 2d 358.)

Pierce, Pierce & Brook, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, Lawrence O'Dell Sanders, was charged by information in the district court of Muskogee county, Oklahoma, with the crime of burglary in the second degree allegedly committed on or about December 15, 1951, in Muskogee, Oklahoma. In said information in substance, it was charged he did break into a wire gate and a glass door of a certain lumber yard in Muskogee and enter therein where he did take, steal, and carry away without the knowledge and consent and against the will of Ray Lewis, owner, the sum of $19.24 lawful money, with the intent to deprive said owner thereof, and to convert the same to his own use and benefit. He was tried by a jury, convicted, and his sentence fixed at a term of 2 years in the penitentiary; judgment and sentence was entered accordingly, from which this appeal has been perfected.

There is but one question raised on the appeal, that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt.

The evidence is entirely circumstantial. The record shows that the defendant had been employed by Mr. Lewis as a helper in the lumber yard for about 2 months at the time of the crime. It appears that on the day in question the defendant's wife picked up his check in the morning; the lumber yard closed at noon, it being Saturday. The defendant was engaged in drinking, and apparently became without funds. Early in the evening he called Mr. Lewis and arranged for a $10 advance on his next week's pay. At about 6:45 p. m. he called Mr. Boss, the bookkeeper, and told him of Mr. Lewis' agreement. Mr. Boss went to the yard and got $10 out of the cash drawer, leaving $19.24 therein. He waited for the defendant to show up but he did not come, so Mr. Boss went by Mr. Lewis' place, and told him he had the $10 and would give it to the defendant, if he saw him. He testified that night the yard was burglarized and the $19.24 stolen. The burglar left part of the fabric of a coat attached to the wire in a hole in the gate through which he gained entrance to the lumber yard, before going to the office and before he broke the glass door, opened it and went in to ransack the cash drawer. He related that the defendant and others had access to the drawer in making change in yard sales. The most important part of Mr. Boss' testimony was that in the sum of $19.24 left in the drawer was a fifty-cent piece that had been defaced by a shot from a 22 rifle. He testified he saw it several times during Saturday morning before closing time. Mr. Lewis' testimony was substantially to the same effect.

The defendant said he did not show up to get the $10, because he was drinking and Mr. Lewis being a preacher, he was afraid of being fired if Mr. Lewis found out about his drinking.

The defendant and a friend of his, Jim Perry, and Perry's girl friend, a June Parks, went on the round of drinking. They testified they met at the Bell Tavern about 7:00 p. m., December 15, 1951. When they first met the defendant was wearing his overcoat. During the tour of drinking the defendant left his overcoat in the Bell Tavern, and appropriated a bus driver's jacket, which he was wearing at the time of his arrest.

But, in these rounds of drinking the defendant was not always with Jim Perry and June Parks; generally they would leave one place together and defendant would follow them in his automobile. At their last drinking bout at the Tumble Inn, June Parks, the girl with Jim Perry, gave Don Smith the proprietor, a 50¢ piece that had been defaced by a shot from a 22 rifle, for 10 nickles, with which to play the pinball machines and the juke box. Later the defendant asked Smith for its return, stating, "I didn't want to part with that coin at all".

The record shows that after leaving the Tumble Inn, June Parks got into Jim Perry's car and what later proved to be the defendant's overcoat was found on the right side of the driver's seat; June Parks pushed it to the middle and Jim Perry pitched it over behind the seat. The next day Perry was stopped, and the overcoat found in his car with the piece torn out of it corresponding with the piece found on the wire fence. He told the officers that he didn't know who put the overcoat in his car, but it was there when he and the Parks woman got in the car after leaving the Y Club. He related it had not been there before. The last time he saw it before that was as it hung in the Bell Tavern. The coat had the defendant's name on an identification tag on the inside pocket. The defendant testified when he got ready to leave his coat was gone and he took the bus driver's jacket hanging in the place. Sanders knew Perry's car because Sanders was with him when he bought it. The defendant was arrested still wearing the bus driver's jacket. The jacket had the name of Mike Locust in it. The defendant denied on arrest that he knew to whom the jacket belonged. The officer removed it and found the name of Mike Locust in it. At the trial he sought to excuse this attempt at deception by saying he denied knowing whose it was so as not to involve Mike Locust. When he was arrested he had $9 in change on him, mostly $1 bills.

Several things clearly appear in the foregoing evidence. The defendant had knowledge of the money in the cash drawer. He had been working for the lumber yard for about 2 months. His knowledge of the hole in the wire gate may reasonably be inferred. He was apparently without funds, since his wife picked up his check and he didn't get it. This conclusion is supported by the fact he called Mr. Lewis and arranged for a loan of $10. He was informed Mr. Boss, the bookkeeper, would meet him and give him the money. Hence he knew there was ample money from which to make the loan. By his own admission he did not get the $10 because he was drinking and he was afraid Mr. Lewis would find it out, so he made no effort to contact Mr. Boss relative to the same. We may take judicial knowledge that it was after dark on December 15, 1951, at 7:00 p. m., when he met Jim Perry at the Bell Tavern. He had plenty of time during the evening to have committed the burglary. Moreover, some one wearing his overcoat left the piece of material snagged therefrom hanging on the wire gate. Only a drunk man would probably not have been cognizant of the tear, at the time the same occurred. He was drunk, at least in such a condition he could not conceal it, by his own admission. At the first opportunity he took off his overcoat, and put on the bus driver's jacket which, from the evidence it may be reasonably concluded he appropriated. He continued drinking. He was out of the presence of Jim Perry and June Parks during the evening several times. The opportunity for the burglary was present, either before or after meeting Perry and June Parks. His overcoat found its way into Jim Perry's car. He knew the Perry car for he was with Perry when Perry bought it. There was no mistake about into whose automobile the overcoat found its way, or the intent of the person who put it there. At the Tumble Inn, June Parks presented to Don Smith the defaced 50¢ piece for change with which to play the juke box and marble machines. The defendant reclaimed it saying, "I didn't want to part with that coin at all". Thereby he definitely connected himself

with the burglary, for only some one who knew of its identity and peculiar significance, in relation to the burglary, would have been interested in reclaiming it. Any one else would have been glad to have Mr. Smith keep it as a good riddance. If he had not so deported himself the blame no doubt would have fallen on his friend Jim Perry. When he was arrested this man who had been broke before the burglary and who had been buying beer most of the night had $9 on his person. There is but one conclusion that can be reached, that is, the evidence is conclusive of the defendant's guilt. The foregoing, when measured by the defendant's prior admitted record for visiting a disorderly house, assault and battery, resisting an officer, numerous arrests for drunkenness, disturbing the peace and petit larceny, present but one conclusion, that of guilt. A fact may be established which naturally and logically flow from a chain of events and circumstances as by positive, direct proof. Moffitt v. U.S., 10 Cir., 154 F. 2d 402, certiorari denied, 328 U.S. 853, 66 S. Ct. 1343, 90 L. Ed. 1625; Scott v. U.S., 10 Cir., 145 F. 2d 405, certiorari denied, 323 U.S. 801, 65 S. Ct. 561, 89 L. Ed. 639.

In Kirk v. State, 32 Okla. Cr. 361, 241 P. 205, this court said:

"The jury are the exclusive judges of the credibility of the witnesses and the weight and value of the evidence, and may find a defendant guilty from the inferences arising from circumstantial evidence and disbelieve positive evidence to the contrary. In such case, where from the evidence different inferences may be drawn, this court will not substitute its judgment for that of the jury and reverse the judgment."

In Nichols v. State, 91 Okla. Cr. 203, 218 P. 2d 407, this court said:

"One may be convicted on circumstantial evidence alone, when all the circumstances proven are consistent with each other and with the hypothesis that the defendant is guilty, and at the same time inconsistent with any other rational hypothesis."

In Ritter v. State, 84 Okla. Cr. 418, 183 P. 2d 257, 259, this court said:

"The general rule in criminal cases is that where the evidence is circumstantial, the facts shown must not only be consistent with and point to the guilt of the defendant, but must be inconsistent with his innocence."

To the same effect is Fleetwood v. State, 95 Okla. Cr. 163, 241 P. 2d 962; Seals v. State, 92 Okla. Cr. 272, 222 P. 2d 1037. We are of the opinion that the evidence herein points conclusively to the defendant's guilt and will support no other reasonable hypothesis. The judgment and sentence of the trial court is therefore affirmed.

POWELL, P. J., and JONES, J., concur.