# SWIFT v. STATE.

No. A-11215.   July 5, 1950.

(220 P. 2d 300.)

44

Harold McArthur and Conn Linn, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The defendant, Bert Swift, was charged in the court of common pleas of Tulsa county, with the crime of driving an automobile while under the influence of intoxicating liquor.  A jury was waived, and the defendant was by the court found guilty and sentenced to serve a term of five days in the county jail, and to pay a fine of $75.

The offense was alleged to have been committed in Tulsa county, Okla., on the 11th day of September, 1948, by then and there driving and operating a motor vehicle upon a public highway at a point six miles west of Sand Springs, in Tulsa county, while said defendant was under the influence of intoxicating liquor.

The following specifications of error were presented in the brief of the defendant:

"(1) That the decision is contrary to the evidence.

"(2) That the decision and judgment is not sustained by the evidence.

"(3) That the decision and judgment of the court is contrary to law.

"(4) That the evidence fails to establish venue of the offense, if any, and that by reason thereof the court had no jurisdiction over the offense as charged or the person of this defendant.

"(5) That the court erred in overruling defendant's demurrer to the evidence.

"(6) That the court erred in overruling defendant's motion for new trial."

We shall consider the specifications in order as presented in defendant's brief.

Considering the fourth assignment of error, the record does not disclose in the evidence presented on behalf of the state any direct proof of venue; only circumstantial evidence is present from which venue may be inferred. At the close of the evidence of the state, counsel for defendant did not demur to the evidence of the state and did not raise the issue of venue during the progress of the trial. The only mention made of the alleged failure to prove venue is set forth in paragraph 4 of the motion for a new trial. In the case of Edwards v. State, 25 Okla. Cr. 167, 219 P. 427, 428, wherein the question of venue was involved, the court said in the body of the opinion:

"We do not mean to hold that, as to the defendant, there is a presumption that the offense proved was committed within the county where the case was tried, but only that where it is apparent that the court and the jurors have personal knowledge of the places named by the different witnesses, tending to show that the offense was committed within the county, and the defendant desires to challenge the venue, he should do so by a request for an instructed verdict because of insufficient proof of venue, and also as a ground for a new trial, in order that the trial court might determine this issue."

This rule has been affirmed by this court in the recent case of Kilpatrick v. State, 90 Okla. Cr. 276, 213 P. 2d 584.

Of course, it is the duty of the prosecution to prove venue, but if the defense has reason to question venue,

then counsel should not sit by and avoid the issue, for if he has evidence that the alleged offense was in fact committed without the boundaries of the county where the offense is being tried and without the jurisdiction of the court, the trial court should have an opportunity to pass on the matter. This does not mean that if there is a total lack of evidence, both positive and circumstantial, to prove venue, that this court would uphold the jurisdiction of the trial court, but unless defense counsel raises such question during the course of the trial, this court will seek to uphold the jurisdiction of the court, because to do otherwise might encourage invited error. As stated by this court in Edwards v. State, supra:

"It has been decided by this and other courts that it is not necessary in a criminal case to prove venue by direct testimony, but that the venue may be established by circumstantial evidence. It has also been held that the venue need not be shown beyond a reasonable doubt."

A number of early cases are cited in support of this rule. See also Kilpatrick v. State, supra, and Fannin v. State, 65 Okla. Cr. 447, 88 P. 2d 671, 673, and Wheaton v. State, 85 Okla. Cr. 132, 185 P. 2d 931.

In Fannin v. State, supra, this court held:

"Courts of the state take judicial notice of the boundaries of the state and the counties of the state, and also the geographical location of cities and towns within the state."

In the instant case, prosecuting witness O. B. Patterson, a state highway patrolman, testified:

"Q. Where did you first observe him? [defendant]. A. At a point about six miles west of Sand Springs, on Highway 33. Q. What was he doing? A. When I first observed him, he had either just stopped or was stopping. His car had turned south on a country road off the high-

way and when I passed he was slumped over the wheel. When I first observed the car, I thought it was going to turn, and when I saw him I backed up and came back to see what the trouble was. I knew he was either asleep or passed out. Q. Did you see him stop the car? A. I wouldn't swear it was perfectly still—it was off the highway, and was either stopped or almost stopped when I observed it. * * * Q. Had you noticed the car before? A. Not until I saw it in the intersection—turned off there in the road. * * * Q. Did you have any conversation with the defendant? A. I talked to him and asked him to wait there in his car until I went to my car and radioed, and when I went to my car to use the radio he drove off. Q. Where did he drive to? A. He headed south on that country road. Q. Did you follow him? A. I pursued him to the turn, between a half and a quarter of a mile. * * *"

On cross-examination witness Patterson further testified:

"Q. He was off the slab? A. He was off like he intended to turn around. Q. But was he off? A. Off 33. * * * Q. Drove up that road south? A. Yes. Q. How far? A. A quarter or half a mile."

Witness further testified that defendant ran into the bar ditch and that he backed his car out and thereafter drove it up the road probably 50 yards to the corner and left it in front of a house there and asked a couple of men living there to look after it until he could send out for the car.

Charles Reece, witness for the state, was not present when the arrest was made but testified as to location of the defendant's car and the road intersection with Highway 33 substantially as witness Patterson.

Charles McCalip, witness for the defense, testified that he lived out of Sand Springs on Route No. 4, and on the highway going to Keystone, but on the Mud Creek

road about a half mile off the highway and six miles west of Sand Springs; that returning to his home from Sand Springs about 5 o'clock on the afternoon in question, he first saw defendant parked in his car on the Mud Creek road about 30 or 40 feet off the highway; that later officer Patterson pushed defendant's car to his home down the Mud Creek road.

The defendant when he testified did not deny the location of the arrest as testified to by Officer Patterson, but his testimony indicated the location of his car as testified to by the other witnesses.

Adhering to the reasoning advanced in the Edwards and Kilpatrick cases, supra, it is our conclusion, after a careful examination of the record in the instant case, that there is ample circumstantial evidence reflected to show that the alleged offense with which defendant was charged happened in Tulsa county, it being our conclusion that the point six miles west of Sand Springs, which we take judicial notice as being a town in Tulsa county, Okla., along Highway 33 and 30 to 40 feet south along a country road one-half mile from said point, is entirely in Tulsa county.

Counsel next argues specifications 1, 2 and 3 together. It is contended that the evidence is not sufficient to sustain the conviction.

Patrolman Patterson testified that he found defendant asleep in his car and aroused him and found him thick-tongued, incoherent and mumbly, his eyes red, and that he admitted that he had been drinking and that he asked him to sit in his car until he could return to his patrol car and radio, but that defendant attempted to drive away and drove into the bar ditch a short way down the country road that he had been parked on; that

he overtook defendant and had him get out of his car and that defendant staggered, and witness found a pint bottle of whisky about half full in the back seat of defendant's car.

R. D. Blanton, witness for the state, testified:

"Q. How did he talk [defendant]? A. His speech was incoherent, he kept begging us to take him home. He stated he knew he had too much to drink, but didn't see any use in arresting him. Q. Did you notice how he walked? A. He staggered, and he had trouble getting up the court-house steps."

Charles Reece, highway patrolman, and witness for the state, testified:

"Q. Did anything happen on the way [when they were taking defendant to jail] that involved Swift? A. He talked to—I believe his nephew. Q. What was the conversation? A. He asked us what we were going to do and we said we were going to put him in jail. Q. Who? A. I believe it was his nephew—the gentleman sitting back there (indicating)—and I told him we were going to put him in jail and Swift said, 'No, they won't—they are a couple of good fellows', and his nephew said, 'I see they are; that is where you ought to be, as drunk as you are'—or words to that effect."

For the defense Paul Louvier testified that on the day of this incident he had occasion to see the defendant while in the patrol car on the way to jail. He testified that in his opinion the defendant was not drunk. He said he was possibly drinking and was very talkative, but the witness could not say the defendant was drunk; that he was always talkative; that the defendant was his uncle, being his mother's brother.

Charles McCalip testified in behalf of defendant that he lived in the vicinity of Sand Springs; that about 5 o'clock in the afternoon on the day the defendant was

arrested, he saw him just about the time he was taken into custody; that he wouldn't say that the defendant was drunk or drinking, though he admitted that he saw almost a pint of whisky in the patrol car, did not know where it came from. When asked if the defendant talked and acted like a drunk man, he said: "He could look like one—his clothes were about half on him."

Defendant in his own behalf testified that he had been drilling an oil well and running 8-inch pipe the other side of Mannford. He further testified:

"Q. Ran the pipe when? A. Friday, and anchored it. Just before leaving the well, the scouts came along—two of them. Q. You don't mean these highway patrol? A. No, oil scouts for the big companies. Of course, it is customary for scouts to visit wells and get their logs, and they come along and I was just about ready to come home—anchoring up the pipe then—I had been out there two nights and practically two days—they had already copied the log and · one of them went back to his car and brought a piece of a pint of whisky, and the three of us drank it. That was at the drilling well. One of them was copying the log and when he got it copied we talked about the adjoining well logs and compared them with the one we were drilling, and I told the boy, 'I've got to go in.' I told him that I was worn out. I had already changed clothes in the dressing room and one of them went over to his car to get a blank to finish the log and he brought back a piece of a pint of whisky—I had taken a little drink—and he asked the two of us—this scout and me, if we wanted a shot, and I said 'no', because I was going home. He finished copying the log and give it to me and I put it in the dog-house—that is where we keep them—and I come on towards home.

"When I got to Keystone my motor was hot—it would only run by spurts—real hot—it had water, but the carburetor was flooded and would hardly go, but I crippled along until I got to this road. It was just barely going and just almost on fire, and I knew that I should get it

off the road—that I should get it off the highway and let it cool off. I was going to drive it up to Campbell's Ranch, and see if I couldn't drain the system and stop the flooding and if I couldn't, I was going to call somebody. It just went dead, and I knew better than to try to start it, so I just took a nap. Then I got out and drove it about two-third up to the house and it went dead again, so I just laid over the wheel and let it cool off; I knew I darsn't start it. * * *

"So I just laid over there and went to sleep—on the wheel. I was plumb off the highway, and the motor was dead. I never had tried to start it—I was afraid to, and the first thing I knew the patrol waked me up. I said to him, 'Don't bother me, I'm not doing any harm.' As soon as my car was cool, I was going to drain it, and he said to me, 'Well you go ahead and sleep; I want to use my radio.' He did go there and then came back and said to me, 'Come on, let's go.' I got out and they tried to drive the car up there—quite a little ways—and the motor wouldn't start, consequently, he got me in the car and just came on home and let the car set there. That's the size of that."

Defendant's attorney further asked him:

"Q. How many drinks did you take? A. Two. Q. Does two drinks make you drunk? A. Yes. Q. They do? Listen to what I'm asking you—does two drinks make you drunk? A. Oh, no. Q. You had been up two days and nights? A. Yes. Q. And those people came along and furnished this liquor and you did take a drink, but you stopped your car because it was dangerous? A. Yes."

We conclude that there was sufficient evidence to sustain the charge of which the defendant was convicted. See the case of Walker v. State, 89 Okla. Cr. 284, 207 P. 2d 341, 342, wherein we said:

"1. Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the same and determine the facts.

"2. The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in the evidence, on which the jury can reasonably conclude that the accused is guilty as charged."

Also, we held in the case of Heald v. State, 78 Okla. Cr. 130, 145 P. 2d 206, 207:

"* * * A jury being waived, the judgment of the trial court upon a disputed question of fact, where there is competent evidence to support his finding, will be entitled to the same weight on appeal as the verdict of a jury."

The defendant not having interposed a demurrer in this case, specification No. 5 merits no consideration, and specifications Nos. 5 and 6 being involved in the solution of the propositions heretofore considered, this concludes the errors complained of.

In view of this being defendant's first offense, no accident being involved and defendant having presence of mind enough to drive his car off the highway and stop it, so as not to endanger the lives of other people, and considering all facts and circumstances, it is our opinion that the ends of justice would best be served by modifying the judgment and sentence interposed by omitting the five days sentence assessed, and reducing the fine from $75 to $50, and as so modified, the judgment and sentence is affirmed.

JONES, P. J., and BRETT, J., concur.