James Lewis **PETTIGREW**, Plaintiff in Error,

v.

**STATE** of Oklahoma, Defendant in Error.

No. A–12704.

Court of Criminal Appeals of Oklahoma.

Nov. 10, 1959.

958 ■

Robert J. Wimbish, Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

James Lewis Pettigrew, hereinafter referred to as the defendant, was charged by information in the District Court of Pontotoc County with the crime of manslaughter, 1st degree. He was tried before a jury, found guilty, and sentenced to twenty years in the state penitentiary.

The defendant lodges his appeal in this court in due time and asserts three propositions of error as follows:

1. That the court erred in overruling defendant's motion for a new trial for failure of the court to prove venue.

2. That the court erred in refusing to instruct the jury to return a verdict of not guilty because the state failed to prove the "corpus delicti."

3. That the court erred in admitting evidence which was incompetent and prejudicial to the defendant.

The defendant's first contention of error involving the question of venue has been passed on by this court, in numerous cases, unfavorable to the defendant. It is true that there is no positive proof of venue by direct question and answers but the record is full of circumstances from which venue could be established.

An employee of the Smith Funeral Home testified he received a call on January 25, 1958, to go to the Pettigrew home. His testimony was as follows:

"Q. On January 25, 1958 did you receive a call to the Pettigrew home in the Three Hundred Block of East Sixteenth in the City of Ada? A. Yes, sir.

"Q. And about what time was it, Tom? A. Oh, it was about 7:30, or, maybe, just a little earlier than that.

"Q. A. M. or P. M.? A. P. M.

"Q. Tell the Court and jury what happened when you got there. A. Well, the call came in and I asked them if it was an emergency and they said, yes, it was, and I ran an emergency out there and got there as quick as possible. In running an emergency I could park on either side of the street, so I parked on the wrong side of the street, heading east, and a lady came running out with a baby in her arms, or a bundle—it was wrapped up—and saying, 'My baby is dying' and was quite hysterical and started to get in on my side and I told her to run around on the other side and get in— and Murl Harris was with me and he let her get in on the other side. And I ran an emergency out to the Valley View Hospital and when we got out there Murl carried the baby in and the girl had fainted, or 'passed out', seemingly— * * *

"Q. Did you do anything with the baby later on that evening? A. Yes,

sir. After it expired I taken it to the funeral home.

"Q. You took it to the Smith Funeral Home? A. To the Smith Funeral Home.

"Q. Here in the City of Ada? A. Yes, sir.

"Q. And you picked this child up in the Three Hundred Block on East Sixteenth? A. Yes, sir, that is right."

The mother of the deceased child testified on June 5, 1958 that she and her children moved into the Pettigrew home in August and remained until the past February:

"Q. Have you ever lived in the household with James Pettigrew and his mother and dad—A. Yes—

"Q. —and his brothers and sisters? When did you move in there? A. I believe, it was in the last week in August.

"Q. Very shortly after you met Pettigrew? A. Yes.

"Q. And did you take your children with you? A. Yes.

"Q. And were you still receiving this check? A. Yes, sir.

"Q. Was it coming in your name? A. Yes.

"Q. Who was cashing the checks?

"By Mr. Wimbish: We object to that as incompetent, irrelevant and immaterial—

"By the Court: Overruled.

"By Mr. Wimbish: —that has nothing to do with the issues in this case.

"By the Court: She can answer it. Go ahead, Mrs. Vaughan.

"By Mr. Wimbish: Exception.

"Q. Who was cashing the checks? A. I was.

"Q. What were you doing with the money? A. Spending it.

"Q. Were you giving any of it to anybody? A. No.

"Q. How long did you continue to live in the Pettigrew household? A. How long did I continue?

"Q. Yes, ma'am? A. The last week this past February."

The father of the defendant testified in regard to the address as follows:

"Q. You knew that at the time your son was living with her—After they lived together, on Ninth Street, Mr. *Vaughan*, did they move back into your household? A. Well, they stayed down there awhile and then they moved back, and then, we moved down here.

"Q. How come them to move back from the Ninth Street address? A. Well, they said that they wanted to live down there, and so we got a house, all together, and so they paid half—half of the rent and then we would pay half, and so we moved out here on 310 East Sixteenth."

His testimony further reflects that defendant was in the Pettigrew home along with the deceased child during the date of the alleged crime. The defendant also testified that he, Sue, and the three boys shared a room in the Pettigrew home on North Broadway.

It is obvious from a review of the record that the alleged crime occurred in the city of Ada. This court has often said that the court and the jury in aid of proof of venue may take judicial cognizance of the location of cities and towns as within the location of the boundaries of certain counties. See Ford v. State, 52 Okl.Cr. 321, 5 P.2d 170. This court takes judicial notice that the city of Ada is in Pontotoc County. In a very similar case, Payne v. State, Okl.Cr., 276 P.2d 784, 793, this court made the following recitations as to the question involved:

"* * * In Kilpatrick v. State, 90 Okl.Cr. 276, 213 P.2d 584:

"'Only those allegations in an indictment or information which involve the guilt of a defendant are to be proved beyond a reasonable doubt. The venue of an offense does not come within this class, but there must be some proof of venue.

" 'Venue may be proved by circumstantial evidence.'

"In the body of the opinion it was further said:

" 'It is solely a question of the court's jurisdiction over the particular offense alleged in the information.'

"In Swift v. State, 92 Okl.Cr. 43, 220 P.2d [300], 302, it is said:

" ' * * * and venue need not be shown beyond a reasonable doubt.'

"To the same effect is Vanderslice v. State, 59 Okl.Cr. 192, 57 P.2d 267; Dismore v. State, 60 Okl.Cr. 346, 44 P.2d 894; Flannigan v. State, 55 Okl.Cr. 328, 29 P.2d 989; Ford v. State, 52 Okl.Cr. 321, 5 P.2d 170; Rodgers v. State, 50 Okl.Cr. 363, 297 P. 823; Womble v. State, 50 Okl.Cr. 108, 296 P. 515; Burton v. State, 50 Okl.Cr. 33, 295 P. 622; Hatfield v. State, 49 Okl. Cr. 41, 292 P. 1058; Neal v. State, 48 Okl.Cr. 410, 292 P. 571; Cole v. State, 34 Okl.Cr. 366, 246 P. 653; Groh v. State, 30 Okl.Cr. 396, 236 P. 435; Steele v. State, 28 Okl.Cr. 335, 230 P. 760; Edwards v. State, 25 Okl.Cr. 167, 219 P. 427; Jentho v. State, 19 Okl.Cr. 434, 200 P. 251; Arnold v. State, 15 Okl.Cr. 519, 178 P. 897.

■■■ "In the Steele case, supra, this court said [28 Okl.Cr. 335, 230 P. 761]:

" 'It cannot be said that there is no proof of venue in this case. All the evidence on the question of venue goes to prove that the alleged crime was committed in Major county. In the absence of any proof to the contrary, we think this proof was sufficient on the question of venue.'

"In Ward v. State, 13 Okl.Cr. 81, 162 P. 232, it was said:

" 'While it is always a simple matter, and is much the safer plan, for the state to prove venue directly and positively, yet the one essential test is whether or not the venue has in some way been proved, and if it is proved by circumstances or indirect statements which fix the venue, the requirements of the law have been met. Brunson v. State, 4 Okl.Cr. 467, 111 P. 988; Gritts v. State, 6 Okl.Cr. 534, 118 P. 673, 120 P. 669.' "

In addition to these citations adverse to defendant's contention it is doubtful in the minds of this court whether the question was properly reserved. This court held in the case of Swift v. State, 92 Okl.Cr. 43, 220 P.2d 300:

"If the defense has reason to question venue, counsel should not set idly by and avoid the issue. If the defendant desires to challenge the venue because of insufficient proof of venue, not only should this issue be raised in the Motion for New Trial, but request for an instructed verdict should be interposed, in order that the trial court might have opportunity to pass on the matter. * * *"

It is to be noted that at the conclusion of the state's case the defense counsel made the following oral motion:

"Comes now the defendant and requests the court to instruct the jury to return a verdict of not guilty."

He does not mention venue nor call it to the attention of the trial court during the course of the trial or upon motion for a new trial. The Swift case, supra, further said:

"Unless the defense raises the question of venue by request for an instructed verdict because of insufficient proof of venue and also as a grounds in Motion for New Trial, Criminal Court of Appeals will seek to uphold the jurisdiction of the trial court because to do otherwise would encourage invitation of error."

Apparently the defendant's motion for a directed verdict was not made upon the insufficiency of the proof as to venue, but upon failure of the state to prove the "corpus delicti," excluding defendant's extra-

judicial statement. This is defendant's second proposition of error. This court is of the opinion that the corpus delicti was established independent of defendant's extra-judicial statement. It will be necessary to briefly relate the testimony in this regard.

The record reveals that defendant had made a statement before the county attorney which was transcribed; the pertinent part was as follows:

"Q. Now the 23 month old one you referred to—you all call him Billy? A. Yes, sir, we call him Billy.

"Q. Is he the one who died Saturday nite, January 25, 1958? A. Yes, sir.

"Q. He died at Valley View Hospital? A. Yes, sir.

"Q. Your nickname is Sonny, isn't it? A. Yes, sir.

"Q. Sonny, tell me what happened to that child Monday or Tuesday, either the 20th or 21st of January, with reference to one of these small rolling pins. A. Well, we were in the kitchen there and I was in there talking and I picked up a little rolling pin and I was talking to Billy there and I was playing around and I hit him on the head with it on the back of the head and it broke the handle off of it."

* *. * * * *

"Q. All right, then tell us what happened with reference to the burns on the children. A. I had the three boys Wednesday afternoon in the bath tub giving them a bath.

"Q. That was Wednesday preceding the boy's death? A. Yes, sir, just before. And I was giving them a bath there and the water began getting kind of cold, and they began to complain saying it was cold, so I turned the hot water on. When I did and water kind of splashed on Billy and he whines, so I told him to stand up. He stood up first and he fell again, and I told him, 'Well, stand up,' and so he stood up on the side again and he fell again and he fell under the hot water, and he burned his shoulder and his little tail."

* * * * * *

"Q. Next day the child was having difficulty walking, wasn't he? From the burns? A. Yes, sir, he kind of walked you know like someone that was sore, you know. Or galled between the legs, you know, and that was the way he walked.

"Q. What did you do as far as that was concerned? A. You mean in doctoring him?

Q. Yes, or did you try to make him walk? A. Yes, sir, I tried to get him to walk, you know, I just thought maybe it was akernel on his leg. Well, I thought you know, if I could get him to walk around it would limber his legs, you know, wouldn't get so sore.

"Q. How did you try to make him walk? A. Well, I just got him by the hand and we walked up and down the bedroom for a while, and then we opened the door and walked from the bed down to the next door and walked back.

"Q. Did you strike that child on Thursday? A. Yes, sir, I gave him a spanking with a switch then.

"Q. You have seen the bruises on the legs? A. Yes, sir.

"Q. Were they a result of that spanking? A. Yes, sir.

"Q. Just tell in detail about the other bruises on the body. A. Sir, I don't know all about all of those bruises there on his body.

"Q. Tell us about the ones you know of. A. Well, I know one on his chin here—on his left chin—left side of his face, he fell off of the stool from there, hit his face against the bath tub.

"Q. Well, let's start with these bruises about the—behind the left ear. A. Well, there is some bruises where the switch hit. I know about those. I think there's about four of them—

### Phone Call From Dr. Northrip

"Q. Go ahead, James, you were talking about the bruises on the head. A. —there were four little whips back there caused by the switch, but the bruises right behind his ear I didn't even notice that.

"Q. You never did notice it at all? A. Never did notice that bruise at all.

"Q. The marks on his head, you say, were caused from this switch that you gave him a licking with? Thursday? A. It was Thursday, yes sir.

"Q. Those blows that were struck about the head were struck after you had hit with the rolling pin, the toy rolling pin? A. Yes, sir."

\* \* \* \* \* \*

"Q. Did you ever hit that baby about the head with a toy pistol? A. Yes, sir.

"Q. When was that? A. I can't rightly say, sir. It's been about three or four weeks.

"Q. Did you hit him anytime with the pistol after you hit him with the rolling pin? A. No, sir, I didn't.

"Q. Do you have any idea how many times you struck him about the head with that stick after the rolling pin incident? A. No, sir, I don't know for sure.

"Q. You don't recall how many times? A. No, sir.

"Q. Do you recall how many different instances—by that I mean maybe Thursday morning you hit him a couple of times and Thursday afternoon you hit him a couple of times. A. You mean with the switch, sir?

"Q. Yes. A. No, sir, it was just the one time.

"Q. But you struck him more than one blow on the head with that?"

\* \* \* \* \* \*

It was defendant's contention that the statement was inadmissible because the corpus delicti had not been independently proven.

The state produced witness Thomas Edward Watson, an employee of the Smith Funeral Home, Ada, Oklahoma, who testified he received a call to come to the Pettigrew home, 300 block on East Sixteenth about 7:30 p. m. and that it was an emergency call. Upon arrival a lady came running out with a baby, or bundle, in her arms and in quite hysterical fashion saying "My baby is dying." He proceeded with the woman and baby to the Valley View Hospital. Upon arriving at the hospital the woman was passed out. The baby was carried into the hospital and a few minutes thereafter died. The baby was identified to witness as William Vaughan, Jr. He later removed the child to the Smith Funeral Home. On cross-examination he testified he had learned the woman, or mother of the child was named Sue Vaughan.

Dr. Orange M. Welborn was called as a witness for the state and testified he was called to the emergency ward of the Valley View Hospital where he examined William L. Vaughan, Jr. shortly after the patient's arrival. The baby was alive when he arrived, but died at 7:40, fifteen minutes after arrival. His testimony was as follows:

"A. Now, as a part of checking the baby, of course, it was necessary to examine and find the cause for this, and the baby had large eschars—that is, hard areas of burns on the buttocks, the left shoulder, the left hand and the back of both knees, and then had numerous multiple bruises over his head and arms, legs and entire body.

"Q. Did you make a list of those marks, Doctor Welborn? A. Yes, sir, I did.

"Q. Do you have those with you? A. Yes, I do.

"Q. Tell the Court and the jury what they are? A. Well, while in the emergency room and before the child was removed I made these notes and just took a general survey of the findings—of the gross findings—that is, of the findings that you can see, that

were most prominent; concerning the head the baby had abrasions of the bregma. That is the very top part of the skull, with a small avulation—there were three or four in number—

"Q. Doctor, what was that—a small what—avulsion? A. Avulsion, yes—that is, gouged outskin.

"Q. All right. A. Scraped. They averaged about a half of an inch long. There was a small bruise at the bridge of the nose and then on the face and head I counted fourteen separate bruises, the largest concentration of them were about the left jaw. There were abrasions, or, gouged out skin, about eight of them, at about the left ear and they measured from a half to one inch in length; they were concentrated behind the left ear in the region of the left mastoid. And, also, there was an abrasion of the lobe of the left ear. And then on the baby's neck, of course, there was the wound of the tracheotomy which we had performed in the emergency room. Then, on the left shoulder there were second and third degree burns. The third degree burn covered an area of eight to twelve centimeters in diameter—about two and a half by four inches. The area of the second degree burn, surrounding the area of the third degree burn, covered the perimeter of the third degree burn for a distance of about five centimeters, or, about two inches around the third degree burn. Then he had a third degree burn at the base of the first finger of the left hand. I counted seven small bruises on the left forearm and there were two small bruises on the right arm—that is above the elbow. There were ten small bruises of the baby's chest on the anterior and lateral portions of the chest and of the front portion of the abdomen. Then, there was abrasion or a burn—I couldn't tell which it was, of the left lower portion of the abdomen. It looked more, actually, like a burn. On the right leg the baby had three small bruises on the

medial aspect—the inner aspect of the leg, and there was a first and second degree burn of the back side—the top side of the toes of the right foot. A small third degree burn, measuring a quarter by two centimeters—in other words, long,—on the lateral aspect of the upper right leg. On the left leg there was a third degree burn measuring a half by one and a half centimeters of the left popliteal space, that is, the space behind the left knee. Then, of the buttocks there was a third degree burn of both buttocks, measuring six and a half by five centimeters, on each buttocks."

An autopsy was performed by Dr. Ray Northrip, a physician and pathologist in Ada. The autopsy was performed on January 27, 1958, 10:30 a. m. The pertinent part of the findings are related by the doctor as follows:

"Q. Give us the result of the autopsy, Doctor—just tell your findings— not your conclusions but just your findings now, Doctor? A. At the very top of the head there were three bruises of the skin; these bruises are shown at the base of the hair in the scalp— they were at the very top of the head, they were all in an area of about three inches in diameter and each bruise was less than an inch in length. In order to determine the extent of the damaged area at the top of the head, the skin was reflected and examined and it was found that the bruises extended all the way through the skin. And then the bone was removed from the top of the head and it was found that there was bleeding from the brain—the top of the brain—the bleeding was at the top of the brain and in such a location that it was a type of bleeding that occurs from damage to the skull. The damage to the skull was sufficient that it bruised the brain to the extent that the blood vessels on the surface of the brain were broken, causing bleeding over the top of the brain.

"Q. Doctor Northrip, to what extent did this bleeding occur? A. The amount of bleeding was approximately one cupful—we measure it in centimeters—a hundred centimeters—but that is, roughly, a cupful of blood at the top of the head.

"Q. Now, where was this blood located with reference to the inside of the top of the skull and the brain? A. The bleeding—the biggest part of the bleeding was at the top of the skull and then it extended for two or three inches in each direction down the sides of the top of the brain, and was between the bones of the skull and the brain.

"Q. All right, go ahead. A. This bleeding, then, was to such an extent, together with the swelling of the brain, that it caused pressure on the brain, pressing the brain down through the hole where the spinal cord goes down from the brain and into the spine—spinal canal. There are ways of examining this blood clot to tell how long it had been there, and we know that from studying these blood clots that it is a peculiar type of thing that can increase in size, especially with any kind of a bump, but, even, without any more bumps, blood clot at this site absorbs fluid and becomes larger, causing increasing pressure on the brain, pushing it down gradually, and can cause death within a few hours, or even a week or two later, from this increasing pressure, which tends to increase from day to day. The length of time present is determined by discoloration and certain cells that enter the blood clot from the live tissues around it. From examining this—in looking at it with the eyes, and also, examining the tissue with a microscope, it was determined that this blood clot had been present for, at least, three days, and perhaps, not any longer than six days. So, the bleeding had been present for, at least, three days, and could have been for up to six

days, from these things that we found—the discoloration—the brown discoloration that occurred in the tissues and at the sites of the blood clot. Also, there was disturbance found in the lungs. When the brain is pushed down with pressure like this it interferes with breathing and coughing, allowing fluid to accumulate in the lungs. This fluid accumulation was found to be present in the lungs. So, from this examination, it is my opinion that the cause of death was from some force—some blunt force that was applied to the top of the head causing bleeding over the top of the brain with the result of pushing the brain down and disturbing the respiratory center and interfering with the breathing of the lungs—these things, all together, then resulted in death."

Photographs taken by a local photographer of the deceased child were used by Dr. Northrip in pointing out what he considered to be the fatal wounds.

 This court has passed upon this question in numerous decisions. The rule is well stated in Osborn v. State, 86 Okl. Cr. 259, 194 P.2d 176, 178:

"A conviction cannot be had upon a defendant's extrajudicial admissions alone, unless the state proves in some way the corpus delicti, independent of the defendant's admission. Direct and positive proof is not essential to establish the corpus delicti, and it may be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable doubt.

"Where a dead body is found with marks of violence upon it, or other circumstances that indicate that deceased came to his or her death by unnatural or violent means, proof of

such fact, independent of defendant's confession, establishes the corpus delicti in a murder case."

Also, Brown v. State, 9 Okl.Cr. 382, 132 P. 359; Choate v. State, 12 Okl.Cr. 560, 160 P. 34, L.R.A.1917A, 1287; Edwards v. State, 46 Okl.Cr. 77, 288 P. 359.

It is evident from the doctor's testimony and the autopsy findings that the child died by unnatural or violent means and in view of the aforesaid decisions we are of the opinion that the corpus delicti was established independent of defendant's statement and the court was justified in overruling defendant's request for an instructed verdict.

■ Defendant's chief contention of error arises from the fact that the court permitted the county attorney to impeach his own witness and failed to instruct the jury that the conflicting testimony given by the witness at a preliminary hearing and at the trial could only be considered for the purpose of impeaching the credibiltiy of the witness and not as substantial testimony to prove the truth of the statement but as affecting the credibility of the witness.

■ It appears from the record that the state intended to use the testimony of witness Janell Sue Vaughan, the deceased child's mother, as contributory proof of defendant's guilt. The testimony she gave at the preliminary hearing was beneficial to the state and justified the county attorney in calling her as a witness in chief as a part of the state's case. It is quite obvious that she became a surprise witness to the state as her testimony was quite different than the preliminary record indicated. The county attorney, with the court's approval proceeded to impeach the witness upon several issues where a conflict appeared. Under the decision of this court this procedure is permissible where the witness testified differently than what was expected. In the case of Foreman v. State, 38 Okl.Cr. 50, 259 P. 176 this court said:

"Where a party has placed a witness upon the stand believing that he will testify to a given state of facts by reason of testimony given or statements made, and the witness then testifies to a different state of facts injurious to the party calling said witness and in conflict with his previous testimony or statements, the party placing such witness upon the stand may impeach his testimony. This may be done upon the ground of surprise and to explain the placing of the witness upon the stand and to counteract the injurious effect of his testimony."

Donahue v. State, 38 Okl.Cr. 87, 259 P. 179; Bayless v. State, 9 Okl.Cr. 27, 130 P. 520.

In the Foreman case, supra, the court goes further and says:

"It would be a perversion of justice to say that one deceived or entrapped by a witness in this manner may not explain his acts in calling the witness and counteract the injurious effort of his testimony." [38 Okl.Cr. 50, 259 P. 177.]

■ There is much merit to defendant's contention that the trial judge should have given an instruction limiting the cross-examination of the witness to impeachment purposes only. Defendant cites Bond v. State, 90 Okl.Cr. 110, 210 P.2d 784 in support of this contention, wherein the court said:

"Where contradictory statements made by a witness are admissible in evidence for the purpose of impeaching him, they must be confined to contradictions of the testimony of the witness which are injurious to the party seeking to impeach him, and it is duty of the court to clearly inform the jury that such statements cannot be considered as independent substantive evidence against or in favor of the defendant, and the jury can only consider such contradictory statements for the purpose of affecting the credibility of the witness, if they decide that the statements do have this effect, and that

it is unlawful for the jury to consider such statements for any other purpose."

However, a review of the record does not reveal a request for such an instruction. The question was not raised in the motion for a new trial. The question was raised for the first time on appeal. This court has dealt with the identical question in numerous decisions, one of which discusses the matter at great length. In the case of Hicks v. State, 93 Okl.Cr. 311, 227 P.2d 685, 690, the court cites numerous authorities sustaining a conclusion adverse to defendant's contention. In that case the court said:

"In fact we are holding that, under the conditions herewith presented, the trial court should have expressly limited the McCauley girl's statement to her impeachment only, but the trial court failing so to do, the defendant should have requested an instruction in this regard. It rests primarily on the trial court, but secondly, its weight falls on the defendant."

In the case of Dunbar v. State, 75 Okl.Cr. 275, 131 P.2d 116, 122:

"It appears no request for instruction was made on the part of the defense, and that no such error is set forth in the motion for new trial. The record shows that this question is attempted to be raised for the first time in this court, and for this reason counsel for appellant has not properly raised the question."

In the case of Jones v. United States, 14 Okl. 356, 78 P. 100, the court said:

"Where evidence is introduced by way of impeachment and when such evidence is competent for that purpose, and where there is other evidence in the case which reasonably tends to support the verdict, and where there is nothing in the record which tends to show that the jury regarded or considered such evidence in any other way

than as impeaching testimony, this court will not reverse the case for the reason alone that the trial court did not instruct the jury to only consider such evidence as impeaching testimony, and where no such instruction (having been requested by) the party against whom such testimony was offered."

To hold that the court committed reversible error in not instructing the jury as heretofore discussed would require the overruling of numerous decisions heretofore rendered by this court and that the court is not inclined to do.

Defendant argues that the court erred in admitting improper evidence over his objection. The testimony shows that while the county attorney was attempting to impeach his witness, Janell Sue Vaughan, he attempted to establish by cross-examination that the witness and defendant had lived together before and after the error charged. Over the objection of defendant she admitted that she shared a room with the defendant at his parents' home. The obvious intent of the examination was to show that witness and defendant had been living in adultery. She testified that after the death of her child she moved out of defendant's home but resumes the relationship prior to trial and stayed there the night before the trial. To this testimony the defense objected as attempting to prove the commission of a crime other than for which he was being tried and was immaterial and irrelevant. The court overruled his objection. We concur with the attorney general's argument in this regard. It was obvious that the witness had led the county attorney to believe her testimony would be beneficial to the state in proving the crime, but at the time of trial she reversed the field and threw him for quite a loss. Her testimony revealed she had completely changed her attitude and she sought to exonerate the defendant. The county attorney plead surprise and proceeded to impeach the witness. He was justified in advancing testimony to explain his reason for calling the

witness and to show the relationship of the witness and defendant, thus accounting for her change in attitude. To show she had stayed with the defendant and especially the night before the trial would be admissible as it would tend to show a reason for her contrasting stories.

■ The court cannot attach any significance to defendant's last contention of error in that the court admitted testimony over defendant's objection as to the results of an autopsy performed by witness Dr. Northrip. Defendant contends that the autopsy was performed without authority of law and testimony as to the findings was therefore inadmissible. The records reveal that an application was filed before the District Court of Pontotoc County requesting permission to perform an autopsy to determine the cause of death. The district judge rendered an order granting permission. The material part of said order read as follows:

" * * * upon the application of W. B. Ward, Jr., County Attorney of Pontotoc County, Oklahoma for an order of this Court authorizing an autopsy in and upon the body of one William Lafayette Vaughan, Jr., deceased, and it appearing that the said William Lafayette Vaughan, Jr., died at Valley View Hospital in Ada, Oklahoma; that the body was thereafter removed to Smith Funeral Home at Ada, Oklahoma; that the body has multiple bruises and burns on the surface; that the cause of death has not been determined, and that an autopsy should be performed by some duly licensed practicing physician in Pontotoc County, Oklahoma, to determine the cause of death of said deceased.

"It is therefore ordered, adjudged and decreed by the court, that Dr. Ray U. Northrip, a Pathologist, and a duly licensed and practicing physician in Pontotoc County, Oklahoma, be and he is hereby authorized and directed to perform an autopsy in and upon the body of William Lafayette Vaughan, Jr., deceased, and to make such examination that is necessary to determine the cause of the death of the said William Lafayette Vaughan, Jr., deceased, and to file his report of the results of said autopsy with this court within 10 days."

"s/s John Boyce McKeel
"District Judge"

The record is silent as to any objection as to the sufficiency of the application presented or as to the procedure employed. The matter apparently was uncontested by any parties having a right under the statute to object. This court is not familiar with the procedure employed and finds no authority under our statute giving the district court the right to grant the county attorney permission to perform an autopsy. The right to dissect a dead body is governed by statute (Title 21, O.S.A. § 1154, Laws of 1941) and clearly sets forth who may authorize an autopsy and under what condition. When an autopsy is performed contrary to statute the participants subject themselves to civil and criminal liability. However, the irregular manner in which the evidence was obtained does not of itself render the findings of the autopsy inadmissible. The defendant was not related to the deceased and had no right to direct an autopsy or object to one. A similar question was passed on by the Supreme Court of Montana in the case of State v. Harkins, 85 Mont. 585, 281 P. 551, 556. The State of Montana directs by statute that the coroner may direct such examination by a physician as is necessary to determine cause of death. Rev.Code 1921, § 12383.

In the Harkins case an autopsy was performed without authority or request of the coroner. Defendant objected to the testimony upon the grounds that the autopsy was performed without authority of law as it was not directed by the coroner. The court said:

"Whether or not witness had authority to perform the autopsy, the rule is.

that competent evidence should not be excluded simply because it has been obtained in irregular manner."

It is doubtful if the testimony would have been admissible had the defendant been one entitled to object under the statute as next of kin, etc. However, the testimony no doubt was admitted to show the cause of death and did not tend to prove the perpetrator of death. We do not feel the court erred in this respect.

The court appointed attorney, Robert J. Wimbish, is to be commended upon the manner in which he prepared the appeal. Thorough diligence was portrayed and his devotion to his profession was exemplified in spite of inadequate compensation.

The court finds no error sufficient to justify reversal and the judgment and sentence of the trial court is hereby affirmed.

POWELL, P. J., and BRETT, J., concur.